50 CCPA

**Application of Joseph R. RIDEN, Jr., and James P. Flavin.**

**Patent Appeal No. 6962.**

United States Court of Customs and Patent Appeals.

June 20, 1963.

Cushman, Darby & Cushman (Max C. Louis and Alvin Guttag, Washington, D. C., of counsel), for appellant.

Clarence W. Moore, Washington, D. C. (Raymond E. Martin, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

ALMOND, Judge.

This is an appeal from the affirmance by the Board of Appeals of the final rejection of appellants' patent application.[1] All of the claims have been rejected as unpatentable over the prior art.

The invention described in the specification relates to halogenated ethenyl sulfones and to their use as pesticides, primarily as fungicides. Broadly, the formula of the sulfones is

$$R-\overset{\overset{\textstyle O}{\|}}{\underset{\underset{\textstyle O}{\|}}{S}}-\overset{\overset{\textstyle X}{|}}{C}=\overset{\overset{\textstyle Y}{|}}{C}-Z$$

in which R is an alkyl group and at least two of X, Y and Z are fluorine, chlorine or bromine. If only two of X, Y and Z are fluorine, chlorine or bromine, the

---

1. Serial No. 661,287, filed May 24, 1957, for Fungicidal Compositions.

third member is hydrogen. The compounds are said to be effective against fungi, bacteria, nematodes, weeds and a wide range of pests. The specification states that the compounds may be used undiluted as pesticides, but "it is frequently desirable to apply the novel sulfones in admixture with either solid or liquid inert, pesticidal adjuvants."

The claims in issue are divided among three classes: compound, composition of matter, and process. Exemplary of these three types of claims are claims 8, 12 and 21, respectively.

"8.

$$CH_3 \overset{\overset{\displaystyle O}{\|}}{\underset{\underset{\displaystyle O}{\|}}{S}} \overset{\overset{\displaystyle Cl}{|}}{C} = \overset{\overset{\displaystyle Cl}{|}}{CH}$$

"12. A pesticidal composition comprising a surface active agent as a relatively inert pesticidal adjuvant and as an active ingredient a halogenated ethenyl sulfone of the formula

$$R \overset{\overset{\displaystyle O}{\|}}{\underset{\underset{\displaystyle O}{\|}}{S}} \overset{\overset{\displaystyle X}{|}}{C} = \overset{\overset{\displaystyle Y}{|}}{C} - Z$$

wherein R is an alkyl group, at least two of X, Y and Z are halogen of atomic weight not over 80 and the third member of X, Y and Z is selected from the group consisting of halogen of atomic weight not over 80 and hydrogen.

"21. A process for protecting a material from attack by a member of the group consisting of microorganisms and nematodes comprising applying to said material an effective amount of a halogenated ethenyl sulfone of

$$R \overset{\overset{\displaystyle O}{\|}}{\underset{\underset{\displaystyle O}{\|}}{S}} \overset{\overset{\displaystyle X}{|}}{C} = \overset{\overset{\displaystyle Y}{|}}{C} - Z$$

PA 6962 — 2 —

wherein R is an alkyl group, at least two of X, Y and Z are halogen of atomic weight not over 80 and the third member of X, Y, and Z is selected from the group consisting of halogen of atomic weight not over 80 and hydrogen."

In rejecting the claims, the examiner relied on the following:

| | | | |
|---|---|---|---|
| Shumard | 2,731,380 | January | 17, 1956 |
| Jones et al. | 2,743,209 | April | 24, 1956 |
| Giolito et al. | 2,770,638 | November | 13, 1956 |
| Metivier | 2,793,234 | May | 21, 1957 |

Boehme et al., Liebig's Annalen Vol. 587, pages 51–62 (1954) cited in Chem.Abs. Vol. 49, 6823 (1955).

---

The Board of Appeals, in affirming the rejection, relied on Boehme et al. and Metivier, stating that the Shumard, Jones et al. and Giolito et al. references "are retained as cumulative secondary references."

The primary reference is the article by Boehme et al. in a German publication, cited in Chemical Abstracts. This reference shows methyl trichloroethenyl sulfone and ethyl trichloroethenyl sulfone. No uses, either as an insecticide or for any other purpose, are given. The compounds disclosed in Boehme et al. fall within the broad formula given above.

The Metivier patent shows sulfoxide and sulfone compositions useful as fungicides. Pertinent here is the disclosure of aryl dichloroethenyl sulfones which may be admixed with inert diluents, preferably including wetting, dispersing or emulsifying agents. The aryl dichloreth-

enyl sulfones differ from the compounds of the formula disclosed by appellants in that an aromatic ring radical is present in the Metivier compounds where the alkyl group is located in appellants' formula. Metivier only shows phenyl and substituted phenyls as the aromatic rings.

The Shumard patent discloses octyl vinyl sulfone as a molluscacide.

The Jones et al. patent discloses xanthyl and trithiocarbonyl sulfides, sulfoxides, and sulfones as pesticides.

The Giolito et al. patent relates to xanthyl and trithiocarbonyl sulfones as fungicides.

## I. *The Compound Claims*

Claims 3, 8, 9 and 10 are drawn to 1, 2-dichloroethenyl n-alkyl sulfones of various alkyl chain lengths. These claims were found by the board to be unpatentable over Boehme et al., which shows the same sulfones as recited in claims 3 and 8 with an additional chlorine substituted in the 2 or beta position of the vinyl group. It is noted that the sulfones of claims 9 and 10 differ from those of Boehme et al. not only in having one less chlorine atom but also in having one (claim 9) or two (claim 10) more methylene groups. That is, the compounds of claims 9 and 10 are homologs as well as analogs of the Boehme compounds.

Appellants have shown in the specification that the trichloro compounds of Boehme et al. may be used in pesticidal compositions, although the dichloro sulfones of the instant compound claims are preferred. Appellants argue that their disclosure of equivalence may not be relied upon in rejecting the claims for the reasons given in In re Ruff et al., 45 CCPA 1037, 256 F.2d 590.

In addition, appellants contend that the method employed by Boehme et al. could not produce the sulfones of the compound claims because there is no two-chlorine counterpart to the three-chlorine chloral hydrate used by Boehme et al. as a starting material. The board dismissed this argument as "of little relevance" inasmuch as the compounds, rather than the method of making them, are claimed. It is asserted by appellants that the fact that the method used in the Boehme et al. reference could not produce the claimed compounds rebuts any prima facie case of obviousness the analogous chemical structure may support. Moreover, they contend, claims 9 and 10 are homologs as well as analogs, so that there are two distinctions over Boehme et al. insofar as these two claims are concerned. They suggest that the Board of Appeals decisions "in the case of chlorine analogues disclose a case of split personality," referring to Ex parte Teter and Shand, 105 USPQ 192, and Ex parte Teter and Bauer, 105 USPQ 191. Appellants state that the compound claim in Teter and Shand was rejected by the Board of Appeals where there was only one chlorine atom difference over the prior art compounds, whereas in Teter and Bauer compound claims were allowed where the difference was two chlorine atoms as compared to one of the prior art references and one chlorine atom and one methylene group as compared to a second prior art reference. The board relied on its Teter and Shand decision in its opinion below in this case.

We note that different prior art references were applied in the two Teter et al. decisions. What might be obvious in view of one patent of the prior art may well be unobvious in view of another patent, and vice versa, because the disclosures of the two different references may teach those skilled in the art entirely different things. We do not stop to consider the correctness of these two decisions, but merely caution again against the tendency "to freeze into * * * rules of general application what, at best, are statements applicable to particular fact situations."[2]

We are of the opinion that the difference between the sulfones having three chlorines in Boehme et al. and the sulfones having two chlorines in claims 3

2. In re Mills, 281 F.2d 218, 222, 47 CCPA 1185, 1190.

and 8 is such that the properties would be expected to be about the same, in the absence of any evidence to the contrary. Both of the compounds are polyhalogenated sulfones, i. e., sulfones having more than one halogen. One polyhalogenated sulfone may well suggest to one skilled in the art another polyhalogenated sulfone.

There is no showing in this case that the compounds of claims 3 and 8 differ by more than a matter of degree from the compounds of Boehme et al. in *any* properties. It is true that Boehme et al. does not teach that the compounds have insecticidal properties, but there is no showing that they do not. Had there been evidence of a *new* property of the closely related compounds not possessed by the analog, a different case might arise. See In re Papesch, 315 F.2d 381, 50 CCPA ——. Such evidence was not forthcoming during the prosecution of the case. Indeed, the specification of appellants' application indicates that the Boehme et al. compounds have the *same* properties but differ only in degree, giving rise to a "preference" for the dichloroanalogs over the trichloro sulfones.

The decision of In re Ruff et al., supra, relied upon by appellants, is not controlling because there the structural similarity was not such that the equivalency would be obvious to one skilled in the art. Here the prior art shows a compound differing from that of claims 3 and 8, only in that the latter compounds contain one less chlorine atom.

■■ As to the method of making the compounds claimed being different from Boehme et al., we agree with appellants that this fact is relevant. Chemical cases should not be decided solely on the basis of homology or analogy in structural formulae. The determination of obviousness is not the mechanistic overlaying of chemical formulae to observe whether a difference greater than a methylene group or a chlorine atom exists. While the method of making the compounds is a relevant fact to be considered in the question of obviousness of the compounds, the record does not show

the significance of the different method. Appellants apparently did not regard the method of making the compounds as their invention since they did not claim it. We draw no inferences from the failure to claim the method of making the compounds because there could be a variety of valid reasons for not claiming it. On the other hand, we can draw no inferences favorable to appellants from this fact since appellants' method of making the compounds was not considered below. The record does not show whether there are other methods, besides appellants', for making the compounds. It has never been asserted that the method used by appellants is the only method possible for producing the compounds. Accordingly, we are of the opinion that the difference in making the analogous compounds, though relevant, is entitled to little weight in the consideration of the obviousness of the compounds in question.

The Boehme et al. article shows methyl trichloroethenyl sulfone and ethyl trichloroethenyl sulfone which are the first two members of the lower alkyl series of trichloroethenyl sulfones. We do not consider it unobvious to one skilled in the art to produce other lower alkyl trichloroethenyl sulfones analogous to the genus claim 3 on appeal. Claim 3 recites that the lower alkyl group has from 1 to 4 carbon atoms. We are of the opinion that it would be obvious to produce any member of the genus "wherein said alkyl group has 1 to 4 carbon atoms" from the teachings of methyl and ethyl trichlorovinyl sulfones in Boehme et al. It seems to us that there is a clear suggestion from the presence of the methyl and ethyl homologs in the Boehme et al. article to make the propyl homolog. The propyl homolog is recited in claim 9 on appeal again with the added distinction of two chlorine atoms in contradistinction to the three chlorine Boehme et al. compounds. Similarly, we consider claim 10 to be obvious since it merely recites another species of lower alkyl sulfones wherein the alkyl group contains four carbon atoms. One having ordinary skill

in the art would expect similarities between the methyl and ethyl species disclosed by Boehme et al. and the propyl and butyl compounds which are not specifically disclosed. The fact that they do have similarities, as appears from the record, negates appellants' argument of unobviousness, even though the art may not have known of the similarities.

■ In summary, we are of the opinion that the presence of two chlorine atoms, instead of three as in Boehme et al., is obvious to one skilled in the art, particularly where the properties are similar and differ only in degree, as appears from the instant record. Moreover, we find a suggestion of the lower alkyl genus from the presence of the methyl and ethyl species in the Boehme et al. article, so that the propyl and butyl species of claims 9 and 10 are considered obvious under 35 U.S.C. § 103.

## II. The Composition Claims

Claims 12, 18 and 26 are drawn to halogenated ethenyl sulfones as an active ingredient and a relatively inert fungicidal or pesticidal adjuvant as a carrier. These claims were also rejected as unpatentable over Boehme et al.

Claim 12, in defining the active ingredient, is broad enough to include the compounds shown in Boehme et al., but the claim also recites "a surface active agent" as the pesticidal adjuvant of the composition. Claims 18 and 26 are narrower than claim 12 in defining the active ingredient of the composition in that they are limited to *dichloro* ethenyl alkyl sulfones in combination with a surface active agent as a fungicidal adjuvant (claim 18), or as a pesticidal adjuvant (claim 26).

The board was of the opinion that the active compounds were obvious and the inclusion of an inert diluent was not a material or patentable invention. They said:

"The claims which include an inert adjuvant are on no better footing. This difference has previously been considered in many decisions and found not to amount to a patentable distinction. See, for example, In re Craige, Jr., 38 C.C.P.A. 1114; 1951 C.D. 433; 650 O.G. 324; 189 F.(2d) 620; 90 USPQ 33; Ex parte Ligett et al., 121 USPQ 324; In re Rosicky, 47 C.C.P.A. 859; 1960 C.D. 197; 755 O.G. 929; 276 F.(2d) 656; 125 USPQ 341."

Appellants, while admitting that claim 12 is broad enough to include the trichloro ethenyl alkyl sulfones of Boehme et al., argue that "a surface active agent" is not shown or suggested by Boehme et al. The surface active agent is shown by appellants' specification to be advantageous in that it imparts "wetting qualities" to the pesticidal composition and, when larger amounts are used, provides a "physiological" effect, particularly in plant treatment.

It is contended by appellants that the Craige and Rosicky decisions, relied on by the board, are distinguishable because the compound *per se* was claimed in Craige, and the compound in "a pharmaceutical carrier" was claimed in Rosicky, whereas here the surface active agent "has important functions in the composition." They argue:

"Appellants readily concede that surface active agents are conventionally employed in pesticidal compositions. However, first *there must be a recognition that a compound can be utilized in a pesticidal composition before anyone would wish to add a surface active agent. Appellants have made this discovery* and there is nothing in Boehme which would teach or suggest such pesticidal activity." (Appellants' emphasis.)

The solicitor points out that there is no "physiological action" except at high concentrations of the surface active agent, and the claims fail to indicate any properties or ranges of surface active agent. Thus, he contends, the compositions claimed do not necessarily have any physiological action.

As to appellants' contention that adding a surface active agent to a compound

requires recognition that the compound can be utilized in a pesticidal composition, the solicitor argues, first, that there are many uses other than a pesticidal use for surface active agents, and, second, that the words "pesticidal" and "fungicidal" in the preambles of the composition claims are mere "use" labels which should not be accorded patentable significance.

■ We are of the opinion that claim 12 is unpatentable over Boehme et al. The scope of the active ingredient of the claim includes the compounds of Boehme et al. The other ingredient of the composition, the adjuvant, does not define a substance limited to the field of pesticides. Were it true that adding a surface active agent required "recognition that a compound can be utilized in a pesticidal composition," as argued by appellant, the composition might be unobvious. But surface active agents are used in a great number of fields of scientific endeavor. For example, even with no ultimate use in mind, a chemist could well employ a surface active agent to emulsify or disperse the slightly soluble sulfones of Boehme et al. The reference clearly shows that methyl trichloroethenyl sulfone is only slightly soluble in water (one part sulfone will dissolve in 900 parts of water) and ethyl trichloroethenyl sulfone is even less soluble in water (one part dissolves per 1000 parts of water). This would indicate that some additive would be needed to improve the dispersion of the sulfones of Boehme et al. in water. Surely an emulsion of a compound in water is not limited to use as a pesticide.

■ We are constrained to agree with the solicitor that the absence of limitations as to amount of surface active agents diminishes any patentable significance attributable to the "physiological action" of the surface active agent. It seems to us that it would be obvious to a chemist to employ a surface active agent with the slightly water-soluble sulfones of Boehme et al., even though the reference fails to recognize the pesticidal use. The word "pesticidal" in the introduction clause is "an indication of the broad field of contemplated use and is not a limitation to be considered in the question of patentability." In re Hack, 245 F.2d 246, 44 CCPA 954.

The same word, "pesticidal," in modifying "adjuvant" in claim 12, does not appear to limit "surface active agent," since the latter term encompasses a narrower group of additives than is included in "a relatively inert pesticidal adjuvant," according to appellants' specification. In other words, the limitation of "a surface active agent as a relatively inert pesticidal adjuvant" includes a very large number of compounds in the specification, covering three pages of the printed record, that are not restricted to utility in the pesticide field. The same surface active agent may be called an "emulsifying agent" or "a relatively inert pesticidal adjuvant." As noted above, we do not consider even the narrower term "surface active agent" to be an unobvious addition in view of the Boehme et al. teaching.

This is not to say that the term "pesticidal" or the term "fungicidal," in appropriate circumstances, cannot constitute a distinguishing limitation in a claim. We merely find that in this case the terms do not exclude obvious variations over the Boehme et al. compositions, since it would be obvious to add materials within the broad category of substances that are "adjuvants" or, more narrowly, "surface active agents" to a slightly water-soluble compound.

Claim 26 is like claim 12 except that it is limited to dichloro ethenyl alkyl sulfones, whereas claim 12 is broad enough to include the trichloro analogs. Claim 18 is like claim 26 except that the word "fungicidal" is substituted in claim 18 for the broader term "pesticidal" used in claim 26. We do not regard the difference between "pesticidal" and "fungicidal" to be of patentable significance in the facts of this case. Therefore, we will consider claims 18 and 26 together.

This court, in In re Rosicky, 276 F.2d 656, 47 CCPA 859, held that a composition comprising, as an active ingredient,

a novel but obvious variation over a prior art compound and a broadly recited "pharmaceutical carrier" was unpatentable over the prior art compound. We consider the dichloroethenyl alkyl sulfone of this claim to be an obvious variation over the trichloroethenyl alkyl sulfones of Boehme et al., as noted in Part I. We consider the broadly recited "surface active agent" to be commensurate in scope with the "carrier" of the Rosicky case. Therefore, we will sustain the rejection of claim 26 as obvious in view of the prior art aqueous compositions of Boehme et al.

### III. *The Process Claims*

Claims 21 to 25, 27 and 28 were found by the board to be unpatentable over the combination of Boehme et al. and Metivier. The latter reference shows 1,2-dichloroethenyl *aromatic* sulfones which the examiner found to be "very analogous" to the compounds recited in the claims. The board stated:

"* * * Appellants' compounds may be looked upon as somewhat simpler in employing a normal alkyl group instead of either the phenyl or aralkyl group in Metivier, hence more obvious to the chemist."

Claim 21 differs from the other process claims in that the formula of the sulfones used is broad enough to include the sulfones of Boehme et al. All of the other process claims are restricted to the novel dichloro compounds as the pesticide applied to the material to be protected. In claims 24, 25, 27 and 28, seeds are the material protected by the pesticide.

Considering first claim 21, appellants argue that aromatic compounds of Metivier belong to a different class of substances than the aliphatic compounds employed by appellants, concluding "it is clear that the claims are patentable over Metivier." Since the Boehme et al. article shows no use for the compounds disclosed therein, they argue that there is no basis for combining Boehme et al. with Metivier.

Appellants acknowledged the Metivier patent in the specification. The pesticides employed by appellant were compared to Captan, a known pesticide, and reference was made to Metivier's comparisons between Captan and the aromatic sulfones of Metivier. The specification reads:

"* * * In affidavits in support of the Metivier patent, it is shown that many of the compounds of the patent are effective against certain fungi and against these fungi are comparable to Captan, in some instances being slightly better and in other instances slightly worse."

Appellants further compared their alkyl sulfones with the aromatic sulfones of Metivier in their specification, stating:

"It has been noted, for example, that where 1,2-dichloroethenyl phenyl sulfone is ineffective as a seed protectant, the 1,2-dichloroethenyl alkyl sulfones are very good seed protectants. Similarly, where the phenyl compound is virtually ineffective as a soil fungicide, the alkyl sulfones have outstanding soil fungicide activity."

The examiner never challenged the statement in the specification that the alkyl sulfones are superior to the aromatic sulfones of Metivier, but noted that "Metivier's compounds are disclosed as excellent fungicides * * *."

The Board of Appeals was not convinced by the statements of superiority in the specification and the indirect comparison with Captan and stated:

"* * * If appellants are to rely on some unforeseeable superiority in their closely analogous compounds, a comparative showing is the minimum requirement. No such showing is of record. Appellants' reference to the record of the Metivier patent file does not provide an acceptable substitute for such direct comparison, which, in order to be meaningful, must be made under precisely the same conditions."

To provide the comparative showing between the compounds of Metivier and

those of the present invention, appellants submitted an affidavit with their petition for reconsideration. The affidavit purports to show superiority of appellants' compounds in comparison with those of Metivier, in order to confirm the statements in the specification.

The board refused to consider the affidavit on reconsideration, "since reconsiderations are confined to the same record. Rule 196(b)."

In this case it does not appear necessary to rely on the showing of the affidavit because the compounds compared do not bear a close structural similarity. While we agree with the board that the compounds of Boehme et al. are so closely related to the compounds of the claims in Part I as to be obvious, we cannot agree that the aromatic *compounds* of Metivier are sufficiently similar in structure to those of Boehme et al. to suggest a pesticidal *use*. There is nothing in the record to indicate that alkyl and aryl groups are interchangeable in this art. Boehme et al. shows no uses whatsoever.

The solicitor suggests that the claimed "corresponding aliphatic sulfone would have fewer carbon and hydrogen atoms" than the aromatic sulfones of Metivier and would therefore be obvious to one skilled in the art. The examiner never rejected the compounds on the Metivier patent, but apparently recognized that the aliphatic compounds of the present invention were unobvious in view of Metivier. Rather, the examiner appears to have relied on Metivier to provide the suggestion of pesticidal use.

We are of the opinion that appellants have invented a new use for a known compound (or at least a group of compounds including known compounds). In claim 21 this new use has been properly claimed as a process under 35 U.S.C. § 100(b). Appellants were the first to use the compounds of Boehme et al. as

pesticides. We do not feel that such a use would be obvious, to one having ordinary skill in the art, from the teaching of Metivier because of the differences between the respective compounds. The mere fact that the aliphatic sulfones of appellants have fewer carbons and hydrogens than the sulfones of Metivier which have a ring structure does not suggest that these compounds would have similar utility. There is a considerable degree of unpredictability in the pesticide art. In re Schechter, 205 F.2d 185, 40 CCPA 1009. One skilled in the art would not know, it seems to us, that the claimed aliphatic sulfones would be useful as pesticides from the disclosure of Metivier. Since there are no suggested uses in Boehme et al., we are of the opinion that the claimed process of protecting materials from pests is not obvious.

It having been found that the patent to Metivier is too remote in chemical structure to suggest the use of the Boehme et al. compounds as pesticides, the Shumard, Jones et al. and Giolito et al. patents, being even more remote in chemical structure, are not persuasive that such a use is obvious. Moreover, the cumulative effect of the secondary patents does not, it seems to us, provide a greater suggestion of such a use than does Metivier alone.

■ Claims 22 to 25, 27 and 28 define novel compounds in the process, as contrasted with claim 21 which claims the Boehme et al. compounds in the process. Having found claim 21 patentable, it follows that the remaining process claims are patentable for the same reasons.

For the foregoing reasons, the decision of the Board of Appeals is modified to the extent that the rejection of claims 21 to 25, 27 and 28 is reversed. The rejection of claims 3, 8 to 10, 12, 18 and 26 is affirmed.

Modified.